Electronically Filed
Intermediate Court of Appeals
CAAP-10-0000214
09-MAY-2013
08:13 AM

NO. CAAP-10-0000214

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I


STATE OF HAWAI'I, Plaintiff-Appellee, v.
ROBERT H.B. HSU, Defendant-Appellant

APPEAL FROM THE DISTRICT COURT OF THE FIRST CIRCUIT
HONOLULU DIVISION
(CASE NO. 1DTA-10-03917)


SUMMARY DISPOSITION ORDER
(By: Nakamura, C.J., Leonard and Reifurth, JJ.)

Defendant-Appellant Robert H.B. Hsu ("Hsu") appeals from the December 6, 2010 Notice of Entry of Judgment and/or Order and Plea/Judgment ("Judgment") entered by the District Court of the First Circuit, Honolulu Division ("District Court").[1] Hsu was convicted of Operating a Vehicle Under the Influence of an Intoxicant ("OVUII"), in violation of Hawaii Revised Statutes ("HRS") § 291E-61(a)(3) (Supp. 2012) ("Subsection (a)(3)"). The District Court imposed a $250 fine plus additional fees.

On appeal, Hsu argues that the District Court erred in admitting the results of the Intoxilyzer 8000 ("Intoxilyzer") breath test because (1) "the State failed to prove that the Intoxilyzer . . . was operating accurately and/or that the calibration had been tested . . . in accordance with the manufacturer's specifications"; (2) "the evidence showed that no accuracy verification test had been performed at the time of . . . Hsu's breath test"; (3) Hsu's federal and state due process rights were violated by "denying [him] the opportunity to challenge the [breath test] result," thereby unconstitutionally

_____

[1] The Honorable William Caldwell presided.

restricting his ability "to present a complete and meaningful defense"; (4) "the State failed to prove that there was probable cause to arrest and subsequently compel [him] to take the breath test"; and (5) "[t]he Complaint failed to allege the *mens rea*."

Upon careful review of the record and the briefs submitted by the parties, and having given due consideration to the arguments advanced and the issues raised by the parties, we resolve Hsu's points of error as follows:

(1) Compliance with manufacturer specifications is not required to admit breath alcohol test results. To establish the evidentiary foundation for the admission of breath alcohol test results, the State must demonstrate the general reliability of the methodology used and the specific reliability of the test performed utilizing that methodology. *State v. Lowther*, 7 Haw. App. 20, 24, 740 P.2d 1017, 1020 (1987). Additionally, there must be "a showing of strict compliance with those provisions of the Rules which have a direct bearing on the validity and accuracy of the test result." *State v. Kemper*, 80 Hawai'i 102, 105, 905 P.2d 77, 80 (App. 1995) (quoting *State v. Matsuda*, 9 Haw. App. 291, 293, 836 P.2d 506, 508 (1992)) (internal quotation marks omitted).

The rules applicable in this case are found in Title 11, chapter 114 of the Hawai'i Administrative Rules ("HAR") (1993) ("Chapter 114"). *State v. Souza*, 6 Haw. App. 554, 560, 732 P.2d 253, 257-58 (1987). In implementing Chapter 114, the Director of the State Department of Health ("Director" or "DUI Coordinator") has soundly addressed both general and specific reliability concerns. *See* Haw. Admin. R. § 11-114-4, -5 (general reliability); § 11-114-4, -6, -7 (specific reliability). Thus, the District Court did not abuse its discretion when, by requiring strict compliance with those provisions of Chapter 114 that bear directly on validity and accuracy, *see Kemper*, 80 Hawai'i at 105, 905 P.2d at 80, it essentially, and appropriately, deferred to the Director's particular expertise for the limited purpose of establishing admissibility. *See State v. Werle*, 121 Hawai'i 274, 283, 218 P.3d 762, 771 (2009) (observing that showing compliance with Chapter 114 approval

2

requirements for machine and test procedures is a "shortcut" to demonstrating general reliability, and making no mention of manufacturer specifications).[2/]

Therefore, we decline to require that the State demonstrate compliance with manufacturer specifications before breath alcohol test results may be admitted.

(2) The "internal standard" accuracy verification test performed by Honolulu Police Officer Craig Genovia ("Officer Genovia")[3/] strictly complied with HAR §§ 11-114-4, -6. Hawaiʻi courts have long interpreted Chapter 114 to not require that accuracy verification devices utilize ethyl alcohol. *See, e.g., Kemper*, 80 Hawaiʻi at 105-06, 905 P.2d at 80-81 (finding that use of a beam attenuator as an accuracy verification device for the Intoxilyzer strictly complied with Chapter 114); *see also State v. Christie*, 70 Haw. 158, 163-64, 766 P.2d 1198, 1201-02 (1988) (explaining the workings of a beam attenuator).

In addition, Hsu's argument applies a conspicuously selective definition of an "accuracy verification device." Hsu states:

> An "accuracy verification device" is "a device or apparatus used to *substantiate the accuracy* of the machine *when a breath alcohol test* or an accuracy test is conducted." These devices may be simulators, listed on the National Highway Traffic Safety Administration's [("NHTSA")] "Conforming Products List of Calibrating Units for Breath Alcohol Testers" ("CPL") or other "devices or apparatus approved by the NHTSA" or the Department of Health.

(citations and original brackets omitted). Critically, Hsu's definition omits the central sentence in Chapter 114's definition: "These devices or apparatus [sic] may be *internal, external, integral parts of* or attachments to breath alcohol instruments." Haw. Admin. R. § 11-114-4 (emphasis added).

---

[2/]    Hsu also argues that his breath test results should not be admitted because "[n]owhere in this record is there any mention of the procedure used by the supervisor and/or whether that *procedure* was approved by the DUI Coordinator, as required by HAR [§] 11-114-7(a)." Hsu does not refer us to where in the record he raised this issue in the District Court, and he raises this argument on appeal for the first time in his reply brief. Arguments raised for the first time in a reply brief are deemed waived. *See In re Hawaiian Flour Mills, Inc.*, 76 Hawaiʻi 1, 14 n.5, 868 P.2d 419, 432 n.5 (1994).

[3/]    The transcripts use both "Genovio" and "Genovia" for the spelling of the officer's name; it is unclear which is correct. We utilize "Genovia" throughout this decision.

Chapter 114 expressly permits that an accuracy verification device may be an internal or integral part of a breath alcohol instrument. And by implication, the degree of accuracy verification contemplated by Chapter 114 does not extend to components of a breath alcohol machine that cannot be tested by an internal or integral device. Indeed, this comports with prior findings that the use of accuracy verification devices that do not engage the sampling system are nonetheless strictly compliant with Chapter 114. *See Kemper*, 80 Hawai'i at 105-06, 905 P.2d at 80-81.

The accuracy verification device used by Officer Genovia when administering the breath alcohol test to Hsu was in strict compliance with Chapter 114. Officer Genovia testified that he utilized the Intoxilyzer's internal standard as the accuracy verification test. The DUI Coordinator had approved the internal standard as an accuracy verification device for the Intoxilyzer version that Officer Genovia used, a fact of which the court took judicial notice. The internal standard is internal or integral to the Intoxilyzer. Therefore, the District Court did not abuse its discretion in treating the internal standard utilized by Officer Genovia as an adequate accuracy verification test.

(3) Hsu contends that his due process rights were violated when the District Court denied his motion to compel the production of COBRA data,[4] thereby precluding him from presenting "a complete and meaningful defense." Hsu argues primarily that because a breath sample was not preserved following his breath test, due process requires that he have a meaningful opportunity to inspect the test machine, and that he required the COBRA data to do so. Due process, however, does not require that merely potentially useful discovery be provided to defendants.

Hsu objects that his breath sample was not preserved for further testing, but his underlying objection is that he was not afforded the full complement of alternative methods of

[4] Hsu asserts that COBRA data is data generated by and stored within the Intoxilyzer.

obtaining comparable evidence identified in *California v. Trombetta*, 467 U.S. 479 (1984). Specifically, Hsu argues that, unlike the defendant in *Trombetta*, he was afforded no means of challenging the Intoxilyzer calibration.[5]

Hsu fails, however, to address *Trombetta*'s requirement that the evidence must have had an exculpatory value apparent at the time of its destruction. *Id.* at 489. Hsu's argument is crucially deficient because it lacks any suggestion that the police should have recognized that his breath sample was apparently exculpatory, or that the DUI Coordinator, in establishing rules under Chapter 114, should have generally recognized such exculpatory value.[6]

*Trombetta*'s elaboration of why the breath samples were not exculpatory applies here as well. *Id.* Given the DUI Coordinator's certification of the Intoxilyzer and promulgation of testing and calibration procedures under Chapter 114, we similarly find no basis for determining that there would be any more than a "tiny fraction" of cases where preserved breath samples could have proved exculpatory where in the first instance they were inculpatory. While *Trombetta* noted that California performs duplicate testing to protect against machine

---

[5] Hsu also argues that when the Supreme Court referenced the ability to cross-examine the officer who administered the test, the Court "obviously" meant to include the supervisors as ones who could be cross-examined, since supervisors can also be sources of "operator error." We think that there is nothing obvious about Hsu's contention. The Court specifically referenced only the "law enforcement officer who administered the Intoxilyzer test," despite elsewhere referencing weekly calibration checks performed on the machine (implicitly referencing those who perform those checks). *Trombetta*, 467 U.S. at 490.

[6] In a related argument, Hsu argues against applying a presumption of general reliability to the Intoxilyzer. In doing so, he identifies isolated issues around the country involving the Intoxilyzer and other breath alcohol test equipment, but with one exception, these appear to be personnel- or departmental-specific issues and not any basis for finding a significant likelihood that Hawaiʻi or the Honolulu Police Department also suffers such problems. He cites to one state that declined to approve the Intoxilyzer because the device did not satisfy the State's performance criteria. But the Intoxilyzer is a federally certified product, Highway Safety Programs; Conforming Products List of Evidential Breath Alcohol Measurement Devices, 77 Fed. Reg. 35747-01 (June 14, 2012), approved by the legislatively designated alcohol testing expert, *see Souza*, 6 Haw. App. at 560, 732 P.2d at 257-58, and each model must be thoroughly tested at least once every thirty-one days, *see* Haw. Admin. R. § 11-114-7(a). Hsu's argument does not suggest or imply that the police or the DUI Coordinator should have recognized an apparent exculpatory value to preserving breath samples where test results are inculpatory, and given the aforementioned assurances, we do not find that they should have done so either.

malfunctions and Hawaiʻi does not, we do not deem this significant here. Under Chapter 114, Hawaiʻi employs a built-in accuracy-verification test to protect against machine malfunctions. That Hawaiʻi does so, but does not perform duplicate testing, does not suggest any significant likelihood that a preserved breath sample, originally inculpatory, would later prove exculpatory.

*Trombetta* does not require particular access to the Intoxilyzer or COBRA data absent a showing that Hsu's breath sample, if preserved, might have been exculpatory. To the extent that Hsu's argument relies on *Trombetta*, it is without merit.

Setting aside *Trombetta*, Hsu's contention that the District Court's denial of his motion to compel constituted a due process violation is not persuasive. Hsu sought the COBRA data in order to discern any operational issues that the specific Intoxilyzer used to test him might have experienced over time. He indicated no particular reason why he believed that such data would tend to be exculpatory in his case. It appears that, at most, he hoped the data would indicate operational issues, such that he could utilize the data to impeach the test result. Accordingly, we find that the data he sought was merely potentially useful evidence (or that it had only the potential of leading to useful evidence), rather than materially exculpatory evidence that would render the trial fundamentally unfair if not disclosed. Thus, we do not find a due process violation.[2]

(4) Honolulu Police Officer Leon Barcenas ("Officer Barcenas") possessed sufficient information to establish probable

---

[2] Hsu raises two additional arguments, which he claims are related to his due-process argument. First, he calls into question the viability of *State ex rel. Marsland v. Ames*, 71 Haw. 304, 788 P.2d 1281 (1990). *Marsland* is still good law today, and, absent a constitutional violation, forecloses discovery of the COBRA data in the instant case just as it did for copies of the "repair, calibration, and maintenance records" in *Marsland. Id.* at 313, 315, 788 P.2d at 1286-87. While Hsu's contentions might serve to discredit the weight a fact-finder would accord a single test result, we decline to consider abrogating our Supreme Court's holding in *Marsland*.

Second, Hsu contends that HRS § 291E-13 requires disclosure of the COBRA data or Intoxilyzer maintenance records. Reading HRS § 291E-12 and § 291E-13 in the same manner, however, we recognize that each section defines identically the set of occupations that may perform blood testing and that HRS § 291E-12 limits its applicability to blood testing only. Thus, we read HRS § 291E-13 to similarly apply to blood testing alone.

cause upon which to arrest Hsu. Witnessing a suspect commit a traffic violation, detecting an odor of alcohol emanating from the suspect, observing physical characteristics and behaviors consistent with intoxication, and observing the suspect commit several mistakes during a field sobriety test ("FST") are together sufficient to find probable cause to arrest for OVUII. *State v. Ferrer*, 95 Hawai'i 409, 414-15, 431, 23 P.3d 744, 749-50, 766 (App. 2001) (finding probable cause that the defendant committed OVUII where the defendant was observed "traveling at an excessive rate of speed . . . [his] eyes were red, [he] had an odor of alcohol on his breath, [his] demeanor was slow, . . . his speech was slurred[,]" and he failed in several ways to correctly perform the roadside FSTs).

Officer Barcenas witnessed Hsu make a left turn in disregard of a no-left-turn sign. While reviewing Hsu's driving documents, Officer Barcenas noticed Hsu's "watery, glassy" eyes and, while positioned closely to Hsu, Officer Barcenas detected an odor of alcohol emanating from Hsu's breath. During the consequent FST, Officer Barcenas observed Hsu make a series of mistakes. During the "walk and turn" test, Hsu missed one heel-to-toe connecting step on the outbound walk, he incorrectly pivoted rather than turning around using short choppy steps as instructed, and he mis-stepped about a foot's width off of the intended line on the return walk. During the "one-leg stand" test, Hsu held his arms out more than six inches from his body for the duration of the test rather than at his sides, and he was unable to keep his foot in the air, touching it to the ground about halfway through the test.

Collectively, these factors were sufficient to cause a person of ordinary caution or prudence to believe and conscientiously entertain a strong suspicion that Hsu had been driving in violation of HRS § 291E-61, justifying his arrest and the resulting breath test. *See State v. Naeole*, 80 Hawai'i 419, 424, 910 P.3d 732, 737 (1996). Unlike the defendant in *State v. Kaleohano*, 99 Hawai'i 370, 56 P.3d 138 (2002), the odor of alcohol on Hsu's breath and his performance on the FST are not equally susceptible of innocent explanation. We, therefore,

conclude that Officer Barcenas had probable cause to arrest Hsu for OVUII.

(5) Hsu's conviction under Subsection (a)(3) is not infirm for lack of a *mens rea* allegation in the Complaint because the Complaint need not allege *mens rea* under that subsection. *State v. Nesmith*, 127 Hawai'i 48, 61, 276 P.3d 617, 630 (2012). Thus, Hsu's final argument is without merit.

Therefore, the District Court's December 6, 2010 Judgment is affirmed.

DATED:  Honolulu, Hawai'i, May 9, 2013.

On the briefs:

Richard L. Holcomb
(Holcomb Law, LLLC)
for Defendant-Appellant.

Brian R. Vincent,
Deputy Prosecuting Attorney,
City & County of Honolulu,
for Plaintiff-Appellee.

Chief Judge

Associate Judge

Associate Judge